1          UNITED STATES DISTRICT COURT FOR THE
              NORTHERN DISTRICT OF OKLAHOMA
2

3

UNITED STATES OF AMERICA,         )
4                                 )
              PLAINTIFF,           )
5                                 )
vs.                               )   Case No. 23-CR-41-JFH
6                                 )
                                  )
7  BYRON CORDELL THOMAS,          )
                                  )
8              DEFENDANT.         )

9

10

11

12              TRANSCRIPT OF SENTENCING
        BEFORE THE HONORABLE JOHN F. HEIL III
             UNITED STATES DISTRICT JUDGE
13                NOVEMBER 1, 2024

14

15

16

              A P P E A R A N C E S
17

18  FOR THE PLAINTIFF:          KENNETH ELMORE and
                                SHAKEMA ONIAS
19                              U.S. Attorney's Office
                                110 W. 7th St., Ste 300
20                              Tulsa, OK  74119

21
    FOR THE DEFENDANT:          CHRISTOPHER DEANE
22                              Deane & Panagopoulos Law
                                6226 E. 101st Street
23                              Ste 100
                                Tulsa, OK 74137

24

25  Transcribed by:  Laura Griffin, RMR-CRR, Laura_Griffin@oknd.uscourts.gov

1    PROCEEDINGS:

2            DEPUTY COURT CLERK:  Call case number 23-CR-41-JFH,

3    United States of America versus Byron Cordell Thomas.

4        Counsel, make your appearance for the record.

5            MR. ELMORE:  Kenneth Elmore and Shakema Onias on

6    behalf of the government.  Good morning, Your Honor.

7            THE COURT:  Good morning, counsel.

8            MR. DEANE:  Christopher Deane on behalf of the

9    defendant Mr. Byron Thomas who appears in person in the

10   custody of the United States Marshals.

11           THE COURT:  Good morning, Mr. Deane, and good

12   morning, Mr. Thomas.

13       This matter comes on for sentencing here today.

14   Mr. Elmore, were the victims in this matter notified of this

15   hearing and given the opportunity to attend?

16           MR. ELMORE:  Yes, Your Honor.

17           THE COURT:  Are any present and/or do any wish to

18   make any statements?

19           MR. ELMORE:  No, Your Honor.  We received no victim

20   impact statements and they are not present.

21           THE COURT:  All right.  I have reviewed the

22   defendant's objection to the presentence report.  Defendant's

23   objection to the presentence report include objections to the

24   offense conduct, guideline calculation for each count and

25   corresponding group counts, the units assigned for each count

and the criminal history score.

The court has also reviewed the government's response in opposition to defendant's objection maintaining that the presentence report should remain unchanged.

Would either party like to be heard further regarding the objections?  Mr. Deane?

MR. ELMORE:  Not from the government, no, Your Honor.

MR. DEANE:  And nothing further from the defense, Your Honor.

THE COURT:  All right.  The defendant first objects to the offense conduct as written in the presentence investigation report and therefore subsequently objects to the guideline calculations for each count and corresponding group counts.

The defendant argues that the information relied upon in the presentence investigation report comes from police reports and/or other unreliable sources and should not be permitted in preparation of the presentence investigation report.

The offense conduct section as written in the presentence investigation report is a culmination of police reports, trial transcripts, exhibits and evidence produced in the discovery as well as in trial.

After a multi-day trial the defendant was found guilty by a jury of, one, felon in possession of a firearm.  Two, two

1    counts of witness tampering by corrupt persuasion.  Three,

2    four counts of transporting an individual for prostitution.

3    And, four, two counts of sex trafficking by force, fraud and

4    coercion.

5        For a jury to convict on any of the aforementioned counts

6    the jury must find beyond a reasonable doubt that the

7    defendant had committed the alleged acts.  When preparing the

8    presentence investigation report the burden of proof standard

9    is a preponderance of the evidence standard, a threshold less

10   than that beyond a reasonable doubt.

11       The United States Probation Office is not limited to the

12   discovery to which it can use to prepare the presentence

13   report and the court is also not restricted to evidence that

14   may or may not be admissible at trial and may otherwise

15   consider hearsay statements if the statements bear some

16   minimal indicia of reliability.

17       The defendant's objections to the facts as outlined in

18   the offense conduct section of the presentence investigation

19   report are disagreements with or contradictions to the

20   evidence presented at trial and through discovery as well as

21   the verdicts rendered by the jury.

22       The corresponding objections to the guideline

23   calculations are hinged on facts contained in the offense

24   conduct save for the objection to Count 9 which was revised in

25   the final presentence report as requested by the defendant.

1    The facts used in the offense conduct were either proven

2 at trial and supported by the trial transcript which led to

3 defendant's conviction of each individual count or came from

4 reports that bear some minimal indicia of reliability as

5 required by the Tenth Circuit.  For these reasons the court

6 overrules the defendant's first objection in regard to the

7 offense conduct section.

8    Defendant's second objection relating to Count Group 1 is

9 moot as the presentence investigation report was revised as

10 requested by the defendant.

11    In his third objection defendant objects to the guideline

12 calculations for Counts 5 and 7, transporting an individual

13 for prostitution, arguing that Counts 5 and 7 should not be

14 counted separate from Count 3 in Group 1 and should have

15 otherwise not been charged as separate counts in the fourth

16 superseding indictment.

17    The objections to Count 5 and 7 are not guideline

18 determinative and have no effect on the total offense level.

19 Nonetheless as stated in the four superseding indictment

20 Counts 3, 5 and 7 all have separate victims and differing

21 dates as to when the offenses started and ended for each

22 victim and such dates do not overlap.  Therefore defendant's

23 third objection to the presentence investigation report is

24 overruled.

25    Defendant's fourth objection to the presentence

1   investigation report relates to the cross reference to U.S.

2   Sentencing Guidelines Section 2A3.1 from U.S. Sentencing

3   Guidelines section 2G1.1(c)(1) to calculate the guidelines for

4   Count 8.

5        Pursuant to U.S. Sentencing Guidelines Section

6   2G1.1(c)(1), if the offense involved conduct described in

7   Title 18, U.S.C., Section 2241(a) or (b); or Title 18, U.S.C.,

8   Section 2242, U.S. Sentencing Guidelines Section 2A3.1

9   applies.

10        Under Title 18, U.S.C., Section 2241(a) it is unlawful

11   for anyone in the territorial jurisdiction of the United

12   States to knowingly cause another person to engage in a sexual

13   act, one, by using force against that person.  Or, two,

14   threatening or placing that other person in fear that any

15   person will be subjected to death, serious bodily injury or

16   kidnapping.

17        In the instant offense as it relates to Count 8 defendant

18   gave the victim K.D. pills for her to take while performing

19   sexual acts for money.  K.D. reported that the pills made her

20   forget things like her name and other small details.  Further

21   she reported that she would frequently wake up in the middle

22   of sexual encounters.  K.D. stated that she repeatedly asked

23   the defendant to go home but was denied each time.  According

24   to K.D. defendant would present his gun when she requested to

25   leave and that she felt uneasy around the defendant.

1      Based on the evidence presented in discovery, the trial

2   testimony specifically, and the jury convicting defendant of

3   possessing a firearm the court finds that there is sufficient

4   evidence to prove that defendant used force or fear to cause

5   K.D. to engage in a sexual act and to justify the cross

6   reference to U.S. Sentencing Guidelines Section 2A3.1 from

7   U.S. Sentencing Guidelines Section 2G1.1 when applying the

8   applicable guideline to Count 8.  Therefore defendant's fourth

9   objection to the presentence investigation report is

10  overruled.

11      Defendant's fifth objection to the cross reference

12  applied to Count 9 is moot as the presentence investigation

13  report was revised as requested by the defendant.

14      Defendant's sixth objection to the presentence

15  investigation report relates to the cross reference U.S.

16  Sentencing Guidelines Section 2A3.1 from U.S. Sentencing

17  Guidelines Section 2G1.1(c)(1) to calculate the guidelines for

18  Count 11.

19      Pursuant to U.S. Sentencing Guidelines Section

20  2G1.1(c)(1) if the offense conduct involved conduct described

21  in Title 18, U.S.C., Section 2241(a) or (b), or Title 18,

22  U.S.C., Section 2242, U.S. Sentencing Guidelines Section 2A3.1

23  applies.

24      Under Title 18, U.S.C., Section 2241(a) it is unlawful

25  for anyone in the territorial jurisdiction of the United

States to knowingly cause another person to engage in a sexual act, one, by using force against that other person; or, two, threatening or placing that person in fear that any person will be subjected to death, serious bodily injury or kidnapping.

In his objection to Count 11 defendant cites the portion of the trial transcript of the victim of Count 11 C.T. However, defendant grossly misrepresents the trial transcript and only includes a portion of the transcript that do not include C.T.'s recitation of the abuse she suffered at the hands of the defendant.

At trial C.T. testified as to how defendant physically assaulted her for acts she may or may not have performed on men with whom she had sexual encounters.  As a result of one instance of abuse C.T. suffered a black eye, a busted lip, woke bloodied in a bath tub and later found that she had miscarried her child.

Further C.T. was brought into the prostitution ring by defendant after she disclosed that she was struggling financially and trying to regain custody of her children. Defendant used this information to prey upon C.T.'s vulnerabilities and coerce her into participating in the prostitution ring to make ends meet.

Based upon evidence presented in the discovery, trial testimony specifically, and the jury's verdict as to Count 1,

1   possession of a firearm, the court finds that there is

2   sufficient evidence to prove that the defendant used force or

3   fear to cause C.T. to engage in a sexual act and to justify

4   the cross reference to U.S. Sentencing Guideline Section 2A3.1

5   from U.S. Sentencing Guideline Section 2G1.1 when applying the

6   applicable guideline to Count 11.  Accordingly defendant's

7   sixth objection to the presentence report is overruled.

8       Defendant's seventh objection to the presentence

9   investigation report relates to the total number of units and

10  the total offense level assigned to his guideline calculation.

11  For the reasons previously discussed regarding the specific

12  offense characteristics and the applicable cross references

13  the court has ruled on the court finds that the total number

14  of units to determine in the revised presentence investigation

15  report is correct.  Accordingly defendant's seventh objection

16  to the presentence report is overruled.

17      Defendant's eighth objection to the presentence report

18  indicates a reliance on paragraphs 103 and 104 regarding the

19  number of criminal history points added for each of the

20  convictions.  As it relates to paragraph 104, the presentence

21  investigation report was revised to reflect one criminal

22  history point pursuant to U.S. Sentencing Guideline Section

23  4A1.2K and Comment Note 11.  Defendant's probationary sentence

24  was revoked in paragraphs 103 and as noted in paragraph 104.

25      Because the basis for the revocations in paragraph 103

1  and 104 is for the same violation conduct, the revised

2  presentence report is correct.  The criminal history entry at

3  paragraph 103 receives three criminal history points and the

4  entry at paragraph 104 received one criminal history point

5  consistent with the commentary of the guideline.

6      This revision to the presentence investigation report had

7  no effect on the criminal history category that was previously

8  assigned as he has a criminal history score of 17 with the

9  revision and remains a criminal history category VI.

10  Accordingly defendant's eighth objection is overruled.

11      Lastly as for defendant's ninth objection he objects to

12  paragraphs 108 and 109 and argues that the prior offenses are

13  not separated by an intervening arrest and therefore should be

14  treated as a single sentence.

15      Pursuant to U.S. Sentencing Guidelines Section

16  4A1.2(a)(2), prior sentences are counted separately if the

17  sentences were imposed for offenses that were separated by an

18  intervening arrest.  In other words the defendant is arrested

19  for the first offense prior to committing the second offense.

20      However, if there is no intervening arrest, prior

21  sentences are counted separately unless, A, the sentences

22  resulted from offenses contained in the same charging

23  instrument; or, B, the sentences were imposed on the same day.

24      In other words if the prior sentences are covered by A or

25  B, they are treated as a single sentence.  As it relates to

1    paragraphs 107 and 108, defendant was arrested in both cases

2    on November 25, 2014, with no intervening arrest; however in

3    paragraph 107 defendant was sentenced on November 26, 2014,

4    and in paragraph 108 defendant was sentenced on November 24,

5    2015.

6         The cases also had separate charging instruments and the

7    sentences were imposed almost a year apart.  Accordingly

8    neither Section 4A1.2(a)(2)(A) or (B) are present and the

9    prior sentences are treated as separate sentences and

10   defendant's ninth objection is overruled.

11        Now, Mr. Deane, did that address all of your objections

12   to the presentence report?

13             MR. DEANE:  Yes, Your Honor.

14             THE COURT:  All right.  And let me just say, the

15   objections were very thorough and I appreciate the length at

16   which you went to to outline your objections as well as the

17   detail you've gone into in your sentencing memorandum.  I do

18   appreciate that from both sides.

19        All right.  Having resolved the objections the Court

20   adopts the presentence report as noted on this record and it

21   will form the factual basis for the court's sentence today.  I

22   must make an accurate determination of the applicable

23   sentencing range under the United States Sentencing

24   Guidelines.

25        In this case based upon the offenses the defendant was

1    adjudicated guilty by a duly impaneled jury along with the

2    specific offense characteristics, defendant's total offense

3    level is 38, his criminal history category is VI.  Under the

4    applicable guideline provisions the sentencing range for

5    imprisonment is 180 months as to Count 1; 240 months as to

6    Counts 2 and 10; 120 months per count as to Counts 3, 5, 7 and

7    8; and 360 months to life as to Counts 9 and 11.

8         The sentencing range for supervised release is 1 to 3

9    years as to Counts 1, 2 and 10, and 5 years to life as to

10   counts 5, 7, 8, 9 and 11, and the defendant is not eligible

11   for probation.

12        The court may also impose a fine between $50,000 and

13   $500,000.  Restitution is mandatory however the court notes it

14   has not been ascertainable as no restitution request has been

15   made.

16        Is that your understanding, Mr. Elmore?

17             MR. ELMORE:  Yes, Your Honor.

18             THE COURT:  The defendant has moved for a downward

19   departure variance or non-guideline sentence at docket number

20   152 based upon the nature and circumstances of the offenses,

21   defendant's criminal history and characteristics.

22        I am also familiar with the government's response at

23   docket number 154, the government's sentencing memorandum at

24   docket number 156, and the sealed exhibits at docket numbers

25   157 through 158.

1    I also note that I have received a letter written on

2   behalf of the defendant by his brother and I've read that.

3    Do counsel wish to make any arguments regarding any

4   outstanding motions or regarding sentencing?  Mr. Deane?

5        MR. DEANE:  Yes, Your Honor, briefly.

6        THE COURT:  Yes. You may use the lectern, counsel.

7        MR. DEANE:  I'll just start, Your Honor, this

8   morning by thanking the court for its time.  As all counsel in

9   the case is aware you were not the judge who presided over the

10  trial in this case.  That puts a significant workload on this

11  court in order to prepare for sentencing and we're certainly

12  appreciative of the time and attention that you've given to

13  the transcripts, the briefs, as well as all sentencing

14  memorandums and exhibits as well for this court.

15    So, Your Honor, I wouldn't belabor any points that I have

16  made in docket entry number 52, I would stand on briefing by

17  and large for the arguments made there.  I would simply

18  request this court offer some grace or lenience to Mr. Thomas

19  when sentencing.

20    Mr. Thomas is a very relatively young man.  He has family

21  members who depend on him in various ways, and so we are

22  simply requesting that Mr. Thomas be given an opportunity at a

23  second chance somewhere down the road, Your Honor.

24    And with that defendant does wish to make an allocution

25  before this court, Your Honor.

1          THE COURT:  Yes, of course.

2      Mr. Thomas, you may join your counsel here at the lectern

3  and you may make your statement, sir.

4      All right.  Good morning, sir.

5          THE DEFENDANT:  Good morning.

6          THE COURT:  It looks like you have some documents

7  with you and maybe you've written something out and that's

8  perfectly just fine.  Let me tell you, I say this a lot,

9  sometimes when people write things out in advance and then

10  they read them in court, they tend to read them quickly.

11  Maybe you won't do that.  Sometimes folks are nervous and

12  that's perfectly understandable.

13      I say this all to encourage you to take your time, take

14  as much time as you need.  If you're reading something, read

15  it slowly so I can make sure that I understand it, and just

16  proceed whenever you're ready, sir.

17          THE DEFENDANT:  All right.  Thank you, Your Honor.

18      First off there's some, you know, there was some issues

19  that was going on in my case that I don't feel was honestly

20  looked at as far as the sufficiency of evidence and

21  testimonies.  There was a lot of perjured testimony that was

22  material to things that was going on in my case.

23      As far as the presentencing report goes and the

24  prosecutor's memorandum and stuff goes, there is some

25  inconsistencies that I can show.  Certain things that I really

1  want to touch bases on because it's not my character at all,

2  and certain things that some of the witnesses testified to,

3  anybody that knows me, knows that that's not something that I

4  would do or engage in.

5      The testimony that they was given, that they gave, was

6  not consistent with the reports and the interviews that they

7  had previously given to the prosecutors and the agents.  Of

8  course my attorneys didn't present any of that in my defense.

9  I was not represented zealously to the best of the abilities

10 of my attorneys and certain things was left out.

11     So as to Crystal Trevino, her main reason as she stated

12 when it was asked her in the trial, she stated that she didn't

13 feel as certain -- she was feeling a certain type of way

14 because of the bondsman that I started coming in contact with

15 and dealing with.  Then she gave accounts that I beat her

16 bloody and she woke up in a bath tub.  That never happened.

17     In her interviews and supplementals in her reports she

18 stated -- just a second, Judge.  Supplement page two, line

19 four, Trevino stated Thomas beat her multiple times.  She

20 advised she had bruises from head to toe.  She stated it was

21 so bad one time he choked her out and she woke up in the bath

22 tub.

23     That is not anywhere consistent with her trial testimony

24 stating that she woke up and she had been beaten bloody in a

25 bath tub.  That's part of her supplemental.  As well as in her

1  HSI report she gives other accounts from the same situation

2  but she give a different account and she states that she was

3  beaten and bloody and that she miscarried and she didn't find

4  out about the miscarriage until she went to jail and had a

5  commitment.

6    Now, when she testified at trial, she stated that we were

7  in Kansas when this happened and I beat her and she miscarried

8  at a hotel in Kansas.  But in the end in her HSI report she

9  states that this happened in Oklahoma City while we were

10  staying at a hotel at Frontier City that she miscarried a kid,

11  you know.

12    As well as she stated I forced her to prostitute for

13  approximately five to six months.  Now when I met Ms. Trevino,

14  I was fresh out of prison.  I had got out July of 2019.  In

15  her testimony and in other reports she states that she left me

16  in October.  The prosecution asked her, well, what was the

17  main reason that you, you know, finally wanted to leave Mr.

18  Thomas in October.

19    If you do the math from July to October, that's only

20  three months.  So how is it possible that she could be forced

21  to prostitute five to six months.  We were not together five

22  to six months.

23    As well as there is no type of -- there was no type of

24  evidence to even speak to say that I even knew this woman.

25  She didn't present no evidence, there is no text messaging,

1   there is nothing to show that, hey, they had communication,

2   they were in an actual relationship, besides this woman coming

3   and testifying and saying what she's saying.

4       Like I said, her main reason was because of the bondsman,

5   you know.  When you have issues with different females, you

6   know, and I wasn't in a relationship with anybody so I could

7   be with anybody I wanted to, you know, but women, you know,

8   they are emotional, you know, no offense to anybody, but they

9   are emotional and, you know, when -- when they feel things

10  aren't going their way, you know, they tend to feel a certain

11  type of way about it, you know, and so when she stated that it

12  was because I was seeing this bondsman, that is the motive for

13  a person to want to do things, you know, give false, to get

14  back at a person, you know.

15      As far as it goes with K.D. -- sorry, Judge, it's kind of

16  hard to maneuver with these cuffs on.

17          THE COURT:  I understand.

18          THE DEFENDANT:  I am going to take a little moment

19  to read a couple of excerpts from Ms. Douglas.

20          MR. ELMORE:  Judge, if it would be beneficial, if

21  you want to mark it as an exhibit, I wouldn't object to the

22  court having that to review instead of having to read it into

23  the record for the court reporter.

24          THE COURT:  I'm sorry, you're saying that you're

25  offering to allow him to submit the exhibits?  Is that what

1  you're suggesting?

2           MR. ELMORE:  It's the other written reports that

3  Mr. Deane provided.  They're typed, they're in discovery.  If

4  that would be easier than having to read them.

5           THE COURT:  Well, that's fine, but if he wants to

6  read it, I'll listen to the portions he wants to highlight.

7  That's fine.

8       Go ahead, Mr. Thomas.

9           THE DEFENDANT:  All right.  When I first met K.D., I

10 met her through Ms. Nichols which is another witness in the

11 case.  I didn't know Ms. Douglas at all.  She was a friend

12 supposedly of Ms. Nichols.

13      It was represented to me differently, you know.  Come to

14 find out her and Ms. Nichols, Ms. Douglas, had issues in the

15 past over a totally different guy that I had nothing to do

16 with.  This was a year prior to her meeting me,  Ms. Nichols

17 meeting me.

18      So in this whole situation with Ms. Douglas, I asked her

19 for her ID because when I first met her, like I said, I didn't

20 know her.  She looked young to me so, you know, I asked her

21 mom for her ID to make sure she was of age before she got in

22 the car with us.

23      Now, she was supposed to been coming to Tulsa to dance,

24 to strip with Megan.  She met Megan, like I said, through a

25 boyfriend, her previous boyfriend.  She got in contact with

1    Megan via Facebook.

2         In a couple of reports she states that she met Megan a

3    year prior, they were friends and that she wanted to come down

4    to Tulsa to dance and make money with Megan.

5         In another report, in the same police report with another

6    officer, she states her and Megan wasn't friends but she met

7    her a year prior due to an ex-boyfriend and they were cheating

8    together and they decided to go ahead and squash their beef

9    that they had or whatever.

10        But in that same report Ms. Douglas states how she kept

11   track of Ms. Nichols for approximately one year because she

12   was trying to steal her boyfriend and make him a pimp.

13        I don't know if you're not a friend of someone why you

14   would be keeping track of someone other than a malicious

15   intent to do something or something, I don't know.

16        But in the -- in her reports that she -- that the agent,

17   Case Agent Titsworth took from Ms. K.D., she's blatantly

18   stating how she kept track of Ms. Nichols and that her and her

19   boyfriend was going to set Ms. Nichols up and just were using

20   her for her money trying to get her and use her for her money,

21   you know.  And this was all because of them messing with the

22   same guy prior to her meeting me.

23        So she stated I took her phone and she took it from me.

24   But in trial in her trial testimony she stated that I took her

25   phone and I didn't give her phone back, I threw it at her when

1  the cops came to the hotel room, before they came to the hotel

2  room.  But in her HSI report as she's speaking to agents and I

3  don't know if -- I can't remember if it was -- okay, yeah, it

4  was Special Agent Titsworth from down here in Tulsa.

5      And she states I took her phone because she wanted to go

6  home and she stated I took her phone but I gave it back -- but

7  she took it from me.  As well as she states she was able to

8  text her mom and give her mom the code word and she called the

9  police immediately.

10     If you -- Judge, if you refer back to the trial testimony

11 and if you went through the testimony that -- of Ms. K.D., you

12 will notice that she stated that she never had her phone and

13 she didn't get her phone back and she told me if I didn't give

14 her her phone back, that her mom would call the police if she

15 didn't hear from me.

16     And then she was asked by Mr. Elmore, or Ms. Onias:  Did

17 you -- do you recall when you got your phone back, when your

18 phone was given back to you?

19     She said:  Yeah, it was given back to me a day and a half

20 later but by then my mom had already called the police.

21     But in the HSI report as I stated on page three, line

22 two, she was able to text Jacilla and give her a code word

23 which was chicken.  Jacilla immediately contacted the police.

24 Before the police arrived, Thomas held a gun to her head.

25 When the police arrived, Thomas was putting the gun down.

1      She never stated any of this in trial.  She said that she

2  asked to go home and the way I placed the gun down gently had

3  her scared.  Those accounts never happened.  None of that ever

4  happened.  As well as I have exhibits as far as it goes with

5  her saying she never had her phone.

6      THE COURT:  Mr. Thomas, I don't want to stop you

7  from making any presentation you want but I do want to -- I do

8  want to tell you one thing just based upon, you know, some of

9  the points that you're making.  And you're obviously a

10  detailed person, you notice details, you pay attention to

11  details.

12      The things that you're explaining to me in terms of your

13  version of things versus some of the other witnesses, and I

14  can appreciate that you want me to know your side of it and

15  that's just fine, I'm willing to listen, but the one thing I

16  want you to understand is, you know, this is not -- this

17  hearing today is not an appeal of the jury's determination.

18      And what the jury is charged with doing is determining,

19  you know, any disputes of fact and they're the ones that

20  decide the facts in the case in order to determine whether

21  you're guilty or not of the various crimes you've been charged

22  with.

23      Again I don't want to stop you from presenting anything

24  to me that you want.  That's not my purpose here, but I just

25  want you to understand as far as a determination of those

1    facts, those that were presented to the jury, you know, we're

2    not here to appeal that.  That's not the purpose of this

3    hearing.  Just so you understand.

4              THE DEFENDANT:  Uh-huh.

5              THE COURT:  Okay.  But go ahead, I don't want to

6    stop you, I just want to make sure you understand.

7              THE DEFENDANT:  I was just trying to present certain

8    things because things that was written in the prosecutor's

9    memorandum as well as in the presentence report, they're not

10   accurate.

11             THE COURT:  I understand, yes.  And I don't want

12   you -- I don't want you to -- I don't want to detract you from

13   telling me anything you want to tell me.  So go ahead.  So

14   sorry if I interrupted you.

15             THE DEFENDANT:  Okay.  With regards to this gun,

16   with regards to the weapon.

17             THE COURT:  You want your attorney to hand that up

18   to me?

19             THE DEFENDANT:  Yes, sir.

20             THE COURT:  Go ahead, Mr. Deane.  You can present it

21   up here.

22             THE DEFENDANT:  Now, with regards to the weapon as

23   well as -- here you go.  That's the messages.

24        Now, the weapon on your left is the weapon that I was

25   charged with, yes, sir.  That weapon, there was no

1    fingerprints, no DNA done to tie me to this weapon.  The

2    weapon that's on the -- in the picture on the --

3            THE COURT:  So this one on my left, this will be

4    Defendant's Hearing Exhibit Number 1; okay?

5            THE DEFENDANT:  Right.

6            THE COURT:  And then the one on the right, on my

7    right hand, that will be Defendant's Hearing Exhibit Number 2;

8    okay?

9            THE DEFENDANT:  So with regards to Ms. Zickefoose,

10   she testified the officers had her, the prosecutor had her,

11   testify that I bought her this gun.

12       As you can see in the messages and what I'm charged with,

13   that is not the same gun.  Those messages are Ms. Zickefoose's

14   messages to her mother and she's blatantly telling her mom:

15   Hey, see my gun, this is my new gun, it's cute.

16       And her mother states, yeah:  What is it, a .25 or a

17   .380?

18       Ms. Zickefoose responds back with:  A .380.

19       Now, this is the same witness that testified to this same

20   gun being the gun that they said -- that they claimed they

21   allegedly found and said that -- had Ms. Zickefoose testify to

22   me buying her and purchasing her this gun and that's the same

23   gun.

24           THE COURT:  All right.  So the messages will be

25   Defendant's Hearing Exhibits Number 3.  Okay.  All right.

1          THE DEFENDANT:  If you notice the differences in the

2   weapon, there is no possible way at all that that is the same

3   weapon.  But she testified to this being this weapon and the

4   officers testified to this being the weapon that I purchased

5   for Ms. Zickefoose.

6       The calibers are different.  I'm charged with a 9mm.

7   Ms. Zickefoose as you can see in the messages tells her mother

8   that this is a .380.  There's just so many inconsistencies

9   with what was presented which was false.

10       So I'm going to go ahead and read, you know, just what I

11  wrote.  This was not a case brought against me for justice,

12  it's not about human trafficking, transportation for

13  prostitution or any of the other charged crimes.

14       This was about retaliation about a personal vendetta

15  prosecutors and officers have against me for not laying down

16  and just accepting how they assaulted me and violated my

17  rights and scared my two stepchildren by pointing guns in

18  their faces and them having to watch a man they call and see

19  as their dad have to get assaulted.  And as the four year old

20  calls it when he sees a police officer, you beat up my daddy.

21       It's not fair nor is it right that because I exercised my

22  constitutional rights that I am assaulted for doing so by the

23  public servants who are to protect and serve the community.

24  But instead they refer to themselves as being the biggest gang

25  in Tulsa.

1        It's not right that the people that are my potential

2   jurors constantly see my face on the news over and over to

3   refresh my cases on their minds right before trial to make it

4   an unfair biased trial.  Because due to the misinformation the

5   news gives and has given, the people of the community and

6   potential jurors automatically forms the verdict in their

7   minds, and I mean especially with the color of my skin being a

8   major factor here in Tulsa.

9        My attorneys continuously had me sign for continuances

10  for what was explained to me as her needing more time to go

11  over things in the discovery.  But in that time I was hit with

12  multiple different indictments each time after signing for

13  continuances that ultimately led to my trial starting the day

14  after an important event for crimes which I am charged, a

15  human trafficking national awareness walk in a suburban area

16  of Tulsa starting the day before my trial started.

17       This is not any coincidence and regardless of how my

18  attorneys looked on the record it shows how these continuances

19  was done to give the prosecutor more time to give fabricated

20  evidence, false testimony, and continuous indictments and

21  lastly commencement of action in which my trial took place

22  after that important day of awareness.  That is very, very

23  biased and inappropriately prejudicial to me and the fairness

24  of my court proceedings in trial.

25               THE COURT:  Mr. Thomas, just one moment, sir.  This

1   is what I was mentioning earlier, just can you slow down just

2   a little bit.

3           THE DEFENDANT:  Yes, sir.  Okay.

4           THE COURT:  It's not only important, and I can hear

5   you just fine, but the court reporter is also taking it down,

6   and she's pretty good, but you're moving pretty fast.  And you

7   want a good record; right?

8           THE DEFENDANT:  Yes, sir.

9           THE COURT:  So go ahead and proceed, just read it a

10  little bit slower.

11          THE DEFENDANT:  All right.

12      I am not a dumb individual and I'm not like the other

13  criminal defendants here in Tulsa with the same ethnic

14  background.  My freedom and my rights matter to me and

15  regardless of my race I have the right to exercise those

16  rights and be free from retaliation, maliciousness,

17  vindictiveness and harassment per the constitution.

18      Since 2019 I've been profiled countless times by TPD

19  officers.  A single car freshener hanging from my rearview

20  mirror was the start.  But it's crazy, every time I'm brought

21  over to federal court, or any court for that matter, what do I

22  see hanging from the officer's rearview mirror?  The car

23  freshener.  A blatant contradiction to the law and also a

24  reminder of the world me as a black man in Tulsa, Oklahoma,

25  have to live in.

1    It's illegal for this little car freshener to hang from
2  my rearview mirror where I've seen my whole life since a kid
3  go.  It's illegal for a female to send me explicit pictures of
4  herself.  It's even illegal for me to be in a hotel or motel
5  parking lot or to drive through it.

6    No, that's not what it is.  I'm a target because of my
7  race and because I am a strong-minded black man who voices and
8  stands on my rights and what is wrong for other people to try
9  to do to me.  And I speak up for myself when those individuals
10  try to constantly violate me and my rights.  Then that's when
11  it becomes illegal.

12    All these things they target me for to use as probable
13  cause to illegally pull me over, search my vehicle, use all of
14  these profiling things for people like myself to arrest me and
15  bring the legal prosecutions they themselves do.  But I guess
16  since they have the title and the badge, they can get away it
17  and it not be illegal.

18    The big picture I'm pointing out is it's only illegal if
19  you are a target to them and which I've been since the first
20  encounter with them when the officer told me, you'll be seeing
21  my face again.

22    There's a lot of things wrong here in my situation that
23  are not being seen or looked at or just blatantly being
24  ignored.  I can't speak for everyone but I am a first-hand
25  witness to the illegal and unethical acts continuously and

nonstop criminal acts that the prosecutors are aiding and
abetting law enforcement in.

They are driven by retaliatory, malicious and vindictive
motivations because of the cases that have been dismissed in
the past due to their own criminal behavior. One case in
particular is the one where I was assaulted by them. Where
even a sergeant played a big part in the criminal behavior and
assault I'm speaking of, thus causing the case to be
dismissed. Also multiple officers being under *Giglio*
investigations for misconducts and corruption already.

The prosecution and officers has fraudulently validated
an arrest through false and misleading reports by officers to
fraudulently procure probable cause for my arrest and
conviction.

I don't know how Mr. Elmore was able to bring an
indictment for me for Crystal Trevino, but like I said
previously, there was no evidence to even show me and this
woman even know each other. Nor was there any other type of
evidence to support any of the lies she blatantly told or I
should say claims she made.

Everything I've spoke about, I've spoken about, just
shows how we are no longer a country of laws, we are a country
where laws are creatively interpreted and used at its leisure
by those in power of the law. One thing I've realized, it
takes a short time to learn to exercise power but a lifetime

1   to learn to avoid abusing it.

2       When given to the wrong people of authority, that's the

3   first thing they do is act criminally and abuse it along with

4   using the tools given to them to use them to help in

5   furtherance of abusing that power.

6       Mr. Elmore has been acting criminally and unethically

7   losing sight of his moral principles and ethics as not only a

8   prosecutor but an attorney, period.  He has been given more

9   power and authority that come with being a federal prosecutor.

10  And along with that agents to be used at his leisure in which

11  he has weaponized against U.S. citizens to cause fear.

12      Mr. Elmore has sought me out since 2019 while overseeing

13  numerous of cases brought against me by the TPD officers and

14  agents who have conspired with Mr. Elmore and Allison Nutt to

15  harass me, maliciously bring vindictive prosecutions again me

16  in which they failed to gain a conviction because of these

17  illegal and unethical acts that was brought to the light by

18  the attorneys representing me at the time.  And I was not

19  guilty.

20      Witnesses was subpoenaed in which they stated I didn't do

21  the crime charged.  Others failed to comply with the subpoena

22  because they didn't want to participate in something they

23  didn't agree to participate in.

24      Mr. Elmore though being promoted to AUSA was given more

25  power and authority than he had in the state prosecutor's

office to abuse and apply it to some of these same people

making them, forcing them, into becoming victims.  Forcing,

coercing, threatening and intimidating them into contracts

against their will holding the process of the law over

anyone's head who had any type of pending cases or cases that

just hadn't been prosecuted yet.  Using the FBI and Homeland

Security agents as scare tactics and coercive tactics to force

people to do things against their will such as become a

victim.  Abusing the process of the law and his new-found

authority and power to do so, becoming a criminal in his

tactics with total disregard to the law and the ethics which

he is bound by.

     If a person is indeed a victim, they will willingly and

voluntarily be a witness against someone who is being

prosecuted for victimizing them and causing them harm.  You

wouldn't have to use criminal tactics, coercion, intimidation,

and the process of the law abusively to get them to comply and

do what they feel is right.  But they have gone out their way

to force the situation upon people who wanted no parts of it.

And not because they're afraid of me, because they are aware

of their own actions.

     Nobody stated I forced them to do anything or I put fear

in them to do or not to do.  Their excuse for this is people

may be victims and may not know it.  That's total B.S.  We are

talking about grown women and myself able to make our own

1  decisions and it doesn't take a rocket scientist to know when

2  you're a victim.

3       I get it.  Sometimes people are in trouble and need

4  saving and sometimes people who need help don't have the

5  courage to ask for it.  This is not the case here.  There is

6  no danger or no cries for help at all.  They think they're

7  being heroic and saving people or acting like that's what

8  their objective is, but really it's just making it worse.

9       I myself have done things with women for money.  It was a

10 friend of one of the witnesses Megan Nichols who set it up.

11 Was I being trafficked or victimized?  No.  I made a choice

12 when I was told she wanted to pay me for sex and stay the

13 night with her.  That was my choice.  I was judged all the way

14 wrong.

15      I didn't use force, fraud, coercion on anyone.  I told a

16 person a way that other females told me they did things when

17 they were having hard times, that they could make some money,

18 and I didn't do that to use them for anything nor did I keep

19 manipulating the situation, just gave an idea and they made

20 their own choice.

21      I didn't tell nobody to give me their money ever and

22 nobody testified I did either.  Megan was asked why she did

23 that and she couldn't even give a straight answer.  And that

24 was because Megan wasn't new to none of this, she was very

25 true to this lifestyle although she stated I introduced her to

1   this.  She made her own choice to do that just as Chrissy did

2   and said it kind of goes without saying.  They made a choice

3   on their own, not by me telling them to.

4       Is it not a blatant miscarriage of justice for a

5   prosecutor to be able to act so criminally, bringing a

6   prosecution solely for his own personal reasons, acting

7   criminally and using criminal tactics and threatening

8   intimidation and coercion to force people against their will

9   to testify or by threats of prosecution if they fail to

10  cooperate.

11      And I'm not just speaking of failing to comply with the

12  subpoena, letting the guilty go unpunished.  It's not right

13  for a subpoena to be used maliciously to strip away virtually

14  all protection one has as a U.S. citizen just to serve a

15  purpose for a person who is acting vindictively and

16  maliciously for personal reasons.  It's really a question of

17  injustice.

18      Chrissy makes it known without saying, page 394 on over

19  to 395 in the trial transcript:  And when you were served that

20  subpoena, were you threatened by law enforcement or did they

21  tell you anything bad was going to happen to you?

22      Ms. Zickefoose stated:  Well, I was put in handcuffs and

23  I was told I was under arrest for a warrant and then within

24  five minutes from that I was let out of handcuffs and told I

25  wasn't under arrest and only because I was, like, okay, I

1   understand what you're saying and I'll go.  I was told I could

2   even be taken to jail right then even if they wanted to.

3       Now this is a sure sign of threats being made to get her

4   to cooperate.  Words don't just consist of a threat being

5   made.  The intent to formulate the threats through an action

6   of officer's acts and threatening saying she could be taken to

7   jail was the threats and she knew it and that's why she said,

8   okay, I see what you're saying, I'll go.

9       When you act criminally, you know how to maneuver around

10  the actual act to manipulate the threat made through other

11  acts of making the threat.  One of Christine Zickefoose's

12  subliminal but not so subliminal accounts of being threatened,

13  again, page 409 and 410 on cross-examination by the defense:

14  The government asked you if you wanted to be here today and

15  you said no; is that correct?

16      Ms. Zickefoose stated:  That is correct but apparently it

17  don't matter.

18      Why is it that you didn't want to be here,

19  Ms. Zickefoose?

20      Because I care about Byron and once again I didn't want

21  to have to testify on him.

22      See one thing about this, it doesn't matter how you look

23  at it, she's saying in so many words what's obvious.  Yeah,

24  she was told to tell the truth and she did just that.  What

25  she thought hopefully people with common sense would see what

1   is really going on.

2       She was told not to tell the truth about the blatant

3   threats of prosecution for charges they was holding over her

4   head, but she found a way to still elicit to what was going on

5   and hope it was caught onto, but like Ms. Zickefoose said,

6   apparently it doesn't matter.

7       None of these people said I forced this them to do

8   anything against their will except this one person

9   Ms. Douglas, whom I don't know how she was even able to

10  testify.  Her lies were very apparent in her interviews and

11  the police reports, even just blatantly in her testimony at

12  trial.

13      It's totally wrong for them to allow her knowing she's

14  lying to do a person like this.  It's wrong and no matter the

15  dirty looks I get from the victim's advocate people, you-all

16  don't know the truth and don't care about the truth because

17  you're not advocates for the witnesses, you're advocates for

18  the prosecution.

19      They use their power to use these women against their

20  will to serve a purpose for them, and once that purpose was

21  served, they're no longer worried about them.  They're being

22  given power to commit the criminal acts they are prosecuting

23  people for.

24      I was made out to be someone I'm not at all.  I don't

25  understand how a person lives with themselves after ruining

1  people's lives for their own personal gain.  Those are the

2  real victimizers.

3      I have toddlers and kids who need their father in their

4  life, but it's a constant cycle in Oklahoma, Tulsa especially,

5  to keep the father out of the home and let the system help

6  raise the kids.  That way they stay in business.  It's sick

7  and not right.  They constantly want to keep minorities

8  oppressed so their children have less opportunities without

9  the father in the home.

10     My kids was used as pawns in this whole scheme that was

11 put together by the government.  When my son was taken, he

12 wasn't placed with family, because the main objective was to

13 inflict -- the main objective was to use them as pawns against

14 their mother to help the threats that was inflicted on her as

15 well to get her to cooperate and change her story to do as the

16 prosecution wants or they'll get lost in the system.

17     The energy and looks I've been getting needs to be

18 transferred to the ugliness and sickness of the people who is

19 responsible for all that stuff.  But instead you respect them

20 as if they're doing something right and in the best interest

21 of the kids.  But clearly you don't care about the best

22 interest of the kids but an illegal conviction.

23     Just like using your victim's impact pedestal to further

24 manipulate these women for the prosecutor to make them feel

25 like it's okay.  Just so you can make your check and do a job

1    well done for the prosecutor, but you're no different.  It's a

2    collective effort.  How about checking on that person you

3    helped force into this against their will.  How about you help

4    them off drugs and give them a better life.  Do something

5    positive.  Don't manipulate the situation as if you're doing

6    something right because you're not.

7         One thing about it, they will always remember the

8    positive impact I had on their lives and the good person I am

9    and have been to them.  Regardless of what some were made to

10   say to make it sound the best for the prosecution so that they

11   don't face prosecution, I guarantee you in the back of your

12   minds after hearing me speak today you will always question

13   your integrity from here on out because you know within

14   yourself this is injustice and not justice.

15        I'm not making excuses, just making points.  Mr. Elmore

16   has what is known to me to be legal abuse syndrome.  And he

17   knows the witnesses are afraid of the process of the law in

18   which he used in an abusive manner to threaten those witnesses

19   with prosecution if they didn't cooperate and if they spoke

20   about the threats to anyone or in open court, and that's fact

21   not fiction or false fabricated testimony from me.

22        Now I recognize there is a long-standing presumption that

23   the government is always right and the law is always right and

24   acts within the law.  This in reality means that the

25   government can do just about anything it wants to an

1    individual.  And in the event the individual such as myself

2    decides he has had enough mistreatment, abused, and rights

3    violated and decided to go about doing something to stand up

4    for myself and file an action against these corrupted

5    individuals through court, I now have a problem and I'm

6    maliciously being targeted and prosecuted.

7         Regardless of the qualifications these officers and

8    agents and prosecutors have, that doesn't give them the right

9    to go about acting as the mob and terrorizing people's lives,

10   nor does it give them the right to retaliate because cases

11   have been dismissed because of their furtherance of engaging

12   in illegal conducts and acts to procure these cases on me.

13        How can you be a criminal prosecuting an alleged

14   criminal?  Make that make sense to me.  How are you being

15   allowed to engage in criminal acts and commit crimes in the

16   eyes of other public officials and judiciary officials and

17   still be allowed to have a job and continue these acts?

18        It's because of the lack of accountability on both sides.

19   But again the government always acts within the law and is

20   always right.

21        Something I've come to learn while dealing with the Tulsa

22   County Judicial System is there is a major double standard

23   here.  But one thing I also come to realize, when there's a

24   double standard, there's no standard.  There is definitely a

25   different judicial standard depending on the class you belong

1    to though here in Tulsa.

2         If you're wealthy and well off, you can pay for your

3    freedom.  If you're broke and any type of minority, you get

4    railroaded even without evidence.

5         The justice system as we know it is a complex machine.

6    It's designed to maintain order, enact justice, and protect

7    the rights -- enact justice and protect rights all while

8    working within the boundaries of law and order.

9         I have a nuanced understanding of the justice landscape,

10   acknowledging the steeper climb for some people and groups

11   compared to the less challenging paths of others.  Knowing

12   this it's no wonder why someone like Mr. Elmore is able to

13   fail upwards and get promoted when he does wrong.

14        Systemic disadvantages continues to entrap other

15   marginalized groups, especially African American men.  In

16   spite of historical civil rights movement and ongoing social

17   justice advocacy, the quest for equality still feels like an

18   uphill climb, especially in Tulsa, Oklahoma.

19        The disproportionate representation of African American

20   men in arrests, incarcerations, and harsh sentences paints a

21   distressing picture.  This observation is not intended to set

22   one group against another in the pursuit of equality, rather a

23   cause for an examination of the inconsistent impacts of

24   justice and prompts the question, why do some people in groups

25   surge forward or fail upwards while others remain ensnared in

1    entrenched prejudices and systemic biases.

2        See, me, I know my rights.  My rights form the bare rock

3    of my interactions within the justice system whether I find

4    myself engaging with law enforcement, standing in front of a

5    judge or consulting with my attorney.

6        They are more than that, though.  They are pillars of my

7    dignity and my freedom.  There are mechanisms in place to

8    shield from abuses, biases and iniquities.  They maintain the

9    presumption of innocence until proven guilty, ensuring that I

10   am accorded respect and humanity.  This isn't the case in

11   Tulsa.  I am guilty until I have to prove my innocence.

12       See, I'm not ignorant of my rights because I know that

13   that makes you susceptible to intimidation, manipulation and

14   misrepresentation and run the risk of being oppressed by the

15   very system designed to ensure my fair treatment.

16       Comprehending my rights does more than merely safeguard

17   me from potential abuses, it equips me to stand up for myself

18   and others as I did and I was retaliated against by the

19   government officials for doing so.

20       These high-ranking officials entrusted with their roles

21   due to education and experience are expected to maintain

22   balance and protect the principles of justice, however there

23   have been many instances where the outcomes have strayed from

24   the oath they've taken and casting doubts about the system's

25   consistency and impartiality.

1        Those in power often believe they are invincible,
2    untouchable, and shielded from the consequences of their
3    actions.  This is the illusion power creates.  This illusion
4    perpetuates the cycle of power and corruption creating an echo
5    chamber where the powerful continue to fill their desires
6    unchecked and unchallenged until someone as myself comes along
7    and showed that I know how to exercise my rights and I refuse
8    to be violated by these people wielding this power and
9    authority over the community they don't see as an equal.
10        There's a bunny ranch in Nevada that's known as a
11    brothel, a house where a man can pay to have sex, a building
12    where prostitutes, not victims, prostitutes ply their trade.
13    Now why is it that this man can advertise prostitution on TV,
14    billboards, business cards, et cetera, but he is not looked at
15    as a trafficker?
16        There is over 15 women who work for this man.  Some
17    travel from different states to work there to prostitute and
18    they are driven there many times from different states by
19    spouses, friends, or other prostitutes for the purpose of
20    prostitution.
21        Nonetheless, federally prostitution is illegal and the
22    crimes for which I'm charged is going on this very minute and
23    second.  So why is it we haven't seen this man on TV or the
24    world news for running a human trafficking ring as I am being
25    stated on the news to be doing?

1      Nobody here except Keanna Douglas came running and

2   screaming for help in my case.  Nobody filed reports about me

3   forcing, coercing, or fraudulently trafficking them.  In fact

4   it was the opposite.  But again they were indeed forced,

5   threatened, coerced by fraud, corrupt persuasion, by the

6   government and their agents willing their abuse of process of

7   the law to make them come to court and make this case

8   something it's not.

9      What's so crazy to me is the prosecution had an expert

10   witness that was coming from or lived in Nevada coming to give

11   her expert opinion on human trafficking.  But the minute I

12   start telling my attorneys, oh, she's in the heart of it, we

13   need to question her about the bunny ranch and all the things

14   and the brothels and the things I've mentioned here.

15      All of a sudden closer to trial, she's no longer coming

16   to give her expert opinion.  I wonder why?  Something is very

17   wrong here.  And like the letter I wrote this system in Tulsa

18   desperately needs investigated.

19      Prosecutors are committing felonies and getting promoted.

20   Others whom are his subordinates are committing felonies,

21   multiple felonies, and still was and still is a prosecutor and

22   Mr. Elmore knew about them and aided and abetted her in these

23   felonies.

24      Even she failed -- she filed a false police report

25   putting a rape case on someone and this is what protecting the

1  principles of justice is about?  No, this is protecting the

2  principles of corruption and all those involved.

3      Yeah, it's crazy the whole SV -- special victims unit has

4  split up after all the corruption, has been silently swept

5  under the rug, but still they've been able to keep at it in

6  the same capacity only with promotions.  This shows how the

7  police, prosecutors and agents are above and beyond the law

8  and make their own laws as sees fit.  And when you speak up

9  about it, they try and do you like they're doing me.

10      Mr. Elmore and his agents and officers knowingly and

11  corruptly persuaded, induced, enticed Christine Chrissy

12  Zickefoose, Jennifer Escareno Fortanelly, Megan Nichols and

13  even Crystal Trevino knowing that force, threats of force,

14  fraud, coercion and a combination of such means would be used

15  to cause these women to give false testimony known to the

16  government with threats of prosecution for a multitude of

17  charges for some women and others threats to have their old

18  charges picked up and indict them on if they didn't cooperate

19  and do as the government wanted.

20      They tried to go after other women but was unsuccessful

21  because those women didn't want anything to do with this

22  situation as other women stated in this case that was -- that

23  was forced to.

24      The individuals, communities and societies who bear the

25  brunt decisions made by those intoxicated by power are often

1    forgotten in the narrative.  We are the unseen victims of

2    power corruption.  We are forced to maneuver through a world

3    shaped by whims and fancies of those in power, their lives

4    molded by decisions made in board rooms and behind closed

5    doors.

6         In context it's crucial to acknowledge that absolute

7    power not only corrupts the one wielding it but also creates a

8    ripple effect that disrupts and damages the lives of countless

9    others.  This impact extends beyond immediate victims and

10   infiltrates the societal fabric leading to a pervasive sense

11   of disillusionment, mistrust and insecurities.

12        False, misleading reports have become so frequent and

13   defendants are being railroaded due to the illegal and

14   unethical acts by the police.  The people of the community are

15   becoming desensitized to the whole thing because they know

16   prosecutors are going right along with it continuously showing

17   a total disregard for people's rights and the constitution

18   which is in place for all citizens and that is an abysmal

19   development.

20        Your Honor, I know the things I've spoken about and the

21   allegations I've made seem like no way cops and prosecutors

22   are doing these acts.  But, Your Honor, the ugliest truth is

23   always better than the prettiest lies.

24        I'm telling you these aren't just allegations, these are

25   facts.  They know it and I know it.  One thing about it, just

1  because a person makes a choice you may not agree with,

2  doesn't mean they are being victimized.  A lot of people look

3  at sex work, pornography, exotic dancing, et cetera, as being

4  morally wrong.  But it's not their life nor their decision and

5  it's not their business to tell anyone else how to live their

6  lives.  Making choices whether good or bad are a part of life

7  and it's for that person to decide whether it's good or bad,

8  not the prosecutor, not the police, and not agents.

9      All I'm asking, Your Honor, is can you please set my

10  sentencing aside and take in the totality of the circumstances

11  that's at hand with the issues I've spoken about and do what's

12  right in the eyes of justice and you will see what this case

13  is truly about because it's not human trafficking.  It's about

14  one individual and that's me.  It's about me standing up for

15  my rights.

16      This is isn't human trafficking nor is it the other

17  charges, this is prostitution with or without me in the

18  picture.  What are they going to do, keep arresting guys

19  prostitutes take a liking to and charge them for trafficking?

20  Stripping, prostitution, pornography, webcamming, it's its own

21  industry, its own world, like law enforcement, like aircraft,

22  like the entertainment industry, like the space industry.

23      All different types of field of work and industry have

24  their own type of crowd and generally the people in those

25  industries and those fields deal with the people in them

1    because they like to be around and deal with like-minded

2    individuals.  So in the case of prostitution, pornographic,

3    exotic dancing, they know like-minded individuals aren't going

4    to judge them.

5        Human trafficking is real.  There are real people out

6    there being forced against their will and held against their

7    will doing real human trafficking stuff, but this is not it at

8    all.  And I can promise you if these witnesses are interviewed

9    by other investigators not from this area without ties to this

10   area, they would tell all of the truth about what was said and

11   done to them by the government to make them come to court and

12   give testimony that is not true.

13       But I can tell you, whatever they was threatened with,

14   each one of them absent Ms. Douglas, they are scared to speak

15   about it to anyone from this part of the government.  I'm not

16   even so sure Keanna's mother, whom I've met, really knows

17   what's going on.  Why wouldn't she have been in court to

18   support her daughter?  Why wouldn't she bring her in 2020 to

19   state court to make sure she got her justice?

20       Because Keanna is a liar and was out to get Megan and I'm

21   caught in the middle.  I didn't do anything to this girl.

22   It's not right.  She needs to be put in jail for all of the

23   lies she's been able to tell.  This really needs to be looked

24   into.

25       The prosecution has engaged in suborn perjury allowing

1    the witnesses that he made out to become victims to lie on the

2    stand.  Just one quick reflection on Officer Bob David's

3    testimony in trial, page 425.

4         So let me ask you, as a human trafficking and vice

5    investigator, if you're involved in a case with prostitution,

6    what is the focus or goal of that investigation?

7         So we take a victim-centric approach to the

8    investigations that we conduct in our unit, and by that I mean

9    we want to offer women who are at risk or who are engaged in

10   this type of activity as many services and opportunities to

11   get themselves out of this situation as we can and more often

12   than not our focus in these investigations is to find pimps,

13   panderers, human traffickers, people who force these

14   individuals into this lifestyle.

15        See, one thing they didn't tell you is these women only

16   qualify for these services and help if they testify against

17   the person they're with.  Everybody isn't forced into this

18   lifestyle, that's why there's a legal but federally illegal

19   brothel where legit prostitutes work getting paid for their

20   sexual acts as prostitutes do.

21        Some people just like doing what they do and at some

22   point in people's lives they go through hardships and they do

23   whatever it takes to feed their kids.  That's with or without

24   me in the picture.

25        Think about the many that find out about prostitution and

apply for the job or engage in the work.  They're not victims.
If the agents are so worried about prostitutes being victims,
there's multiple brothels and Playboy girls around the world
that need their help, so why aren't they going out their way
to help those being forced into the prostitution jobs they
themselves apply for?  Because as the Agent Bob David stated,
they are all victims and being forced into prostitution by
somebody.

Are these women being forced to work in these businesses?
No, because the same pimp, panderer that owns the business,
gives them a choice to come work in his house of prostitution.
But again it's not about prostitution, it's about the
individual.  It's about the culture and race that's commonly
associated with being pimps and panderers, but yet this owner
of this prostitution house, this brothel, is a free man and
not labeled as a trafficker, a pimp or a panderer, all the
same terms I'm being labeled and prosecuted for being.

This is a federal crime, federal, so how is it this owner
of such a place surges forward in his business when he's
committing all sorts of federal crimes?  Oh, because he's
paying his taxes as Mr. Elmore seemed to be worried about with
Ms. Nichols when he asked her was all that money she lied
about making tax free.  So this man obviously is considered a
businessman.

One thing all these females stated, they felt comfortable

1    doing that around me, approaching me with it.  This was new to

2    me, safe, never wanted for anything, not forced, not coerced.

3    I didn't force anything upon anyone and I never coerced or

4    forced anyone to keep doing anything or do things against

5    their will.

6        There's a big difference between what's going on here and

7    a real trafficker, pimp or a panderer.  See, with those people

8    they don't give anything or do anything for their victims when

9    the money hits their hands.  They don't allow their victims to

10   make their own decisions.

11       I don't care if it's a boyfriend pimp, romeo pimp or a

12   gorilla pimp, their victims don't have any choices or say-so

13   in what goes on or what they do, nothing.  That's not what's

14   going on here in this situation.

15       When women apply to work in a brothel or porn, are they

16   applying to be trafficked?  No, they're applying to be

17   prostitutes plying their trade.  People aren't just born

18   prostitutes, they're told at some point in their life about it

19   from somebody, shown the ropes, whatever, but they are

20   nevertheless made aware of it.

21       Are they being coerced or forced for those that are a

22   part of that lifestyle by the people that are informing them

23   of it?  They have spouses that they give their money to, they

24   pay for stuff for, so are they going to be arrested for being

25   pimps, traffickers or panderers?

1    If a person is telling you, I'm not being trafficked or

2  forced into what I'm doing and they don't want to testify,

3  that's not obviously a victim nor the type of situation

4  needing investigated, especially when the guy is locked up and

5  they're still telling you the same thing so you can't say

6  they're scared of him either.

7    As the judge stated that took -- that oversaw my trial,

8  these cases aren't often prosecuted.  Everybody but that one

9  liar said the same things, he's not like that.  No, I'm not

10  afraid of them.  I'm not being trafficked, I don't want to

11  testify.

12    Those are not statements of victims, those are statements

13  of people whom are engaged in prostitution, who are

14  prostitutes.  Victims are going to act like Keanna Douglas and

15  say such things that she said that wasn't true at all.  Even

16  though I was lied on by this girl, nonetheless those are the

17  statements and actions of a victim.  But come on, now, out of

18  five females this one gives accounts of things these other

19  four didn't?  Be serious.

20    One thing about females, they are vindictive and

21  malicious when scorned or made man by a man and will say or do

22  a number of things to get back at him.  A lot of this goes on

23  with domestic violence cases, human trafficking and pandering.

24  Everybody is all fine and having fun doing everything they

25  want and living it up until they get mad, then the accusations

1  to the police.  Even if the guy did nothing wrong, because no

2  matter what, a woman's word is credible just because she said

3  it happened.  But then after she's no longer mad, she wants to

4  take it back once the damage is already done.

5      Like Crystal Trevino, two people that was with me,

6  including my little sister, one day witnessed this woman pull

7  a gun on me because I was done with her.  She tried bashing

8  out my windows in my car, refusing to let me leave because I

9  was done with her.

10      When the cops came, I just told them I wanted to leave

11  and then she tried to shift everything because I was done with

12  her and wanted to leave and tell the police, don't you-all see

13  what's going on, all three of us females here.

14      The point is, when something doesn't go the way a woman

15  wants such as with Tyra and Crystal, they can say whatever and

16  make a report, and regardless of them lying, they'll be

17  believed.  But luckily I had witnesses that day.  Megan,

18  Jenny, Chrissy, even Crystal had every opportunity to call the

19  cops and say, hey, I'm being trafficked or I'm a victim.  He's

20  forcing me, he's taking my money, I haven't eaten, whatever.

21      But they didn't because they are not victims and they

22  know they're not.  That's why they never acted as such or made

23  reports of such.  They was forced to become something they

24  knew they wasn't and still know they aren't.

25      See, there's plenty of messages that the prosecution and

my attorneys didn't show where many women are reaching out to me wanting me to be with -- wanting to be with me and want me to be in their situation as prostitutes, not me reaching out to them.

Why would a person want to be a victim on purpose, on their own knowing the type of females that be around me on their own if I was this victimizer?  These females know the type of person I am and the life the people around me started having and seeing their come-up from being down, on drugs, suicidal, struggling, not being able to support themselves or their kids, depressed and lonely, to feeling as if they're sitting on top of the world and their lives drastically changed.

Every woman told the court and the jury they could have stopped if they wanted to, it didn't matter to Byron one way or another.  They even stated they were taken care of regardless.  These females take to me because there's a decency to me and a person senses it right away.  Once they meet me, what separates me is because they know I genuinely care.  They know I would rescue anybody if they're in trouble. I don't use anybody for anything.

See now Chrissy is back on drugs, suicidal and getting beat on.  Megan is torn in between doing what's right because it's not right and she knows it isn't but she's on probation and scared to be retaliated against and put back in prison if

1   she speaks up.  But she's still engaged in prostitution along

2   with others -- other things she's since been arrested for.

3         Megan was also supposed to appear to give an -- a

4   victim's allocution on my behalf but I think it funny that

5   when she -- we're talking about these things on video calls,

6   Megan is all of a sudden put back in jail.  Crystal is still

7   engaging in prostitution and has since the trial been arrested

8   multiple times for different charges and cases.

9         What I'm saying is people shouldn't butt in even with the

10  best of intentions.  It's dangerous and an invasion especially

11  when you don't know exactly what's going on or the situation.

12  It does more damage when nobody is asking or running and

13  crying for help.

14        This is not a trafficker, pimp, panderer because with

15  them real victims have no choice.  I'm not that person and

16  everybody had a choice.  Just like it was a choice for me to

17  be with known prostitutes, it be known to friends and family,

18  whoever, and me not be ashamed or worry about what anyone

19  thinks or regardless of reputation or harm.

20        This isn't a situation that constitutes a criminal

21  investigation because these same women are still out there

22  doing the same things.  Are they still being investigated?

23  Even Crystal Trevino spoke proudly when she was asked by

24  Mr. Elmore:  Ms. Trevino, do you still sometimes engage in

25  prostitution activity?

1    She answered, yes, how she's still working without a

2    worry of any kind of investigation.  Why is it investigators

3    aren't worried now?  Obviously because I'm not in the picture

4    no longer.  Why isn't the brothel owners being investigated?

5    Why aren't the female prostitute victims being saved from

6    their trafficker, pimp, panderer?

7    Federally justice should be done the same with no one

8    being exempt from prosecution for the same crimes.  These same

9    women I've spoken about reaching out to me are prostitutes.

10   I've turned many down.  So when Mr. Elmore lied and told the

11   jury it only mattered for someone to be around for their money

12   is total B.S. or I would have done it if that was the case.

13   I was turning many of prostitutes down because it's not

14   about a person being around me for money or prostitution but

15   the person and their character and how we connect.  It's not

16   about the money, period, like the prosecutor lied and to make

17   everyone believe.

18   I have my own money but of course they weren't able to

19   speak about that.  My attorneys as well advised me they're not

20   going to speak about that because I would be worried about

21   being charged with another indictment for things allegedly how

22   I was getting my money.

23   The reason they wanted to be around is like Jenny,

24   Chrissy, Megan and even Crystal stated, they knew they could

25   be safe and comfortable doing that around me, and when you get

1    to know me and who I am, they liked me.

2         A lot of things that they didn't speak about as far as

3    financial coercion and the threat of losing financial

4    stability.  Megan's credit, when I met her, she didn't have

5    any established credit.  Before Megan went to prison, we had

6    got Megan's credit score of 660.  Megan had her own car.  I

7    taught her how to balance, how to budget, how to open a bank

8    account, showed her things that an adult is supposed to do.

9    Megan had her own house, apartment, before -- before I was

10   even put in jail.

11        When it comes to Christine, Christine had a car that was

12   a $33,000 car that we were paying on.  Christine's credit, she

13   didn't have any established credit when I met her.

14   Christine's credit was a 600.  So for all the things that the

15   prosecutor made look and seen to the jury as me just using and

16   manipulating these women for their money and not giving them

17   anything is not true.

18        I have a lot of female friends that are prostitutes and

19   whenever I'm in town or they come to town where I'm at, they

20   always look to me to stay with because they know they're safe

21   and comfortable to work and they like dealing with me, period,

22   being around me.

23        These same females call me daily to talk, see what's up,

24   just look at me as the cool person that I am because they're

25   not used to a person like me being around their type of work

1    and situations.

2        So are they victims too or are they prostitutes?  It

3    doesn't matter to the prosecutor, victim's advocates, agents

4    or police what they are, because again it ain't about them,

5    it's about revenge and retaliation.  It's with a strong black

6    man who refused to get beat on, who refused to do as they said

7    and shut up, boy, as the officer told me after he assaulted me

8    in front of 30 or more of his colleagues calling me a racial

9    slur without a worry in the world to be held accountable for

10   his actions.  This was all caught on video.  That's what this

11   case is about because I got out of jail after this -- the case

12   that I was previously on was dismissed and I filed a civil

13   suit.

14       So it's just like Mr. Elmore stated in his closing

15   arguments.  You speed, you litter, you're breaking the law.

16   You become an outlaw, a criminal.  So when you engage in

17   suborn perjury, when you aid and abet corrupted officers to

18   give false reports that you know are false, when you allow

19   those same officers to knowingly lie under oath in those

20   reports and on the stand.

21       When you as a prosecutor yourself commit adultery, which

22   is still a felony in Oklahoma, aid and abet your subordinate

23   that you're having an affair with to commit felonies when you

24   use the process of the law abusively to turn people into

25   victims, you become a criminal, an outlaw trying to uphold the

1    law.  Make that make sense.

2         This is not equal justice.  How do you still have a job

3    and how are you not being prosecuted yourself?  This is a

4    blatant -- this is blatant prosecutorial abuse and misuse of

5    the justice system.

6         The constitution ensures that anyone accused of a crime

7    in this country is entitled to a full and vigorous defense.

8    But my attorneys did not adhere to that, to this right

9    afforded to me by the 6th and 14th Amendment.  With all these

10   statements made to the prosecutor and agents and multiple

11   interviews and witnesses, I mean by the witnesses, they are

12   bound by what they know to make sure the truth is what's

13   spoken of.

14        It is the prosecution's obligation to correct what

15   testimony they know to be false and inconsistent to what they

16   already know from those previous interviews.  But this was not

17   done on purpose to misrepresent things to the jury to make me

18   look worse.  This becomes collusion and subordination of

19   perjury.

20        There have been -- excuse me.  There have been constant

21   exaggeration of facts, procedural errors, and many, many

22   inconsistencies in the affidavits submitted to the courts by

23   officers and agents as well as false and misleading

24   information to procure probable cause illegally.  This was

25   done deliberately with reckless disregard to the law and my

1  rights as a U.S. citizen.

2      There was an excessive amount of perjury by the

3  witnesses.  Even an attorney Shannon McMurray and police

4  officers and I have proof and evidence of all of it.  My

5  attorneys even knew of everything but didn't present it or

6  show how these people was lying.  Even aided Mr. Elmore in

7  putting a protective order on my discovery knowing that I

8  could only view that with the attorneys present and when they

9  bring it which was never done.

10     Perjury is a felony.  A felony.  So these people need to

11  be held accountable for their actions and prosecuted just the

12  same as I would be because for sure if I had done it, I would

13  be prosecuted.

14     The perjured testimony given was very material and misled

15  the jury to help convict me as well as Mr. Elmore having

16  subpoenaed several people that was going to be in court for my

17  moral support but he used the subpoena to keep them out of the

18  courtroom without using them or placing them -- their names on

19  the witness list.  This was all done because those people knew

20  most of the witnesses and knew it would make them

21  uncomfortable to lie in front of people who know them and the

22  situation.

23     There was many omissions and misrepresentation of

24  facts -- of the facts and information by the prosecution and

25  agents all to get one strong-minded black man and that's me,

1    Byron Thomas.

2        I appreciate you for hearing me, Your Honor.

3            THE COURT:  All right.  Mr. Thomas, thank you, sir.

4    You may a seat for a moment.

5        Mr. Elmore, does the government wish to make any

6    arguments regarding the motions or sentencing?

7            MR. ELMORE:  Yes, Your Honor.  May I approach the

8    lectern?

9            THE COURT:  Yes, you may.

10            MR. ELMORE:  Thank you, sir.

11        Initially, Judge, I would point out that in our

12    sentencing memorandum we attached exhibits and made reference

13    to some of the discovery items that were provided as part of

14    this case.

15        In speaking with Max Deane about that we had an agent

16    prepared to testify but there was an agreement the agent would

17    testify consistently with those items, for the court to

18    consider that testimony would not be needed to sponsor it.  I

19    just want to make sure that's clear for the record.

20            MR. DEANE:  Yes, Your Honor.  We're stipulating to

21    the authenticity of those exhibits.

22            THE COURT:  All right.

23            MR. ELMORE:  Judge, we have -- I know the court has

24    reviewed an extensive amount of discovery and briefing in this

25    case to include the trial testimony and exhibits, and I don't

1   want to belabor the point, but I do feel it is necessary to

2   highlight a couple of things.

3       The first of which, Your Honor, is as the court just

4   heard in terms of acceptance of responsibility I think it's

5   fair to say that Mr. Thomas is not.  That not only has he

6   failed to accept responsibility for any of the acts that he

7   did, there appears to be a detachment from the facts as they

8   occurred at trial.

9       I believe it's important for the record and the court to

10  know, for instance, that Christine Zickefoose was appointed a

11  lawyer to represent her at every meeting that we had.  That

12  that lawyer was present when she testified at the trial.

13      I believe it was also important to note some of the

14  things like the expert that was noticed resided in Chicago and

15  did not live in Nevada.  And so a lot of what this case is is

16  different from how Mr. Thomas views reality.

17      And I believe that is important because as the court

18  knows and what has been provided is the guidelines are to be

19  determined based upon the factors in 35 -- or 3553 which has

20  to go with the individual characteristics, the nature of the

21  crime itself, their criminal history.

22      And in looking at the facts of this case, Your Honor,

23  what Mr. Thomas has been convicted of, not accused of, but

24  what he has been convicted of is preying upon individuals at

25  their weakest.  The evidence that was submitted at trial were

1    a series of women who were in a broken capacity when he preyed

2    upon them and took advantage of them.

3        The information that was recovered from just one of the

4    cell phones not only showed Mr. Thomas blatantly bragging

5    about how he can manipulate women to do things, about his

6    process for doing it, it was filled with numerous amount of

7    women that he constantly pressured and messaged and attempted

8    to recruit.

9        This is not something where the women that we were able

10    to bring to court were the only women that Mr. Thomas either

11    took advantage of or attempted to take advantage of.  And I

12    believe that's important because Mr. Thomas's own words are

13    the best indicator of what he was doing.

14        And as we provided in our sentencing memorandum and what

15    was provided in discovery is some of those words included not

16    only Mr. Thomas even refusing to buy somebody a meal if they

17    wouldn't work for him, it included recruiting Christine

18    Zickefoose's sister to come work for him.  A woman who had his

19    name tattooed on his neck, who professed to love him.  He

20    would in his own words say, she's not my girl, she's just a ho

21    and she knows that.  That is how he viewed these women and how

22    he took advantage of them.

23        Megan Nichols testified to the hundreds of thousands of

24    dollars that she made for Mr. Thomas over their time together.

25    She provided gut-wrenching testimony about servicing an entire

1    construction crew because she wanted to take a trip and

2    Mr. Thomas told her she needed to earn it.

3         When she became pregnant with Mr. Thomas's child, he had

4    her work more to save up money.  She eventually found someone

5    who gave weed and drugs for Mr. Thomas to sell.  That is how

6    he took advantage of them.

7         Your Honor, looking at what an appropriate sentence is

8    here I would also ask the court to consider some of the

9    information in our sentencing memorandum about Mr. Thomas even

10   recruiting detention officers to bring things into the jail.

11   Even when he's incarcerated, he still victimizes and brings

12   other people into the world that involves criminal liability

13   and criminal actions.

14        His interference charges with Christine Zickefoose,

15   everything he has done has been an effort to obstruct.  And

16   for that, Your Honor, we're going to ask the court to consider

17   a sentence that is appropriate.  We do not believe the minimum

18   of 360 is appropriate for this case.

19        The offense conduct that is within the PSR consists not

20   only of his convictions and some of the cases that were

21   dismissed but some of the facts.  We mentioned that in our

22   sentencing memorandum.

23        There was testimony about him preying and targeting

24   Hispanics with Crystal Trevino and Whitney Turney.  We

25   included that because Whitney Turney did provide that

1    information.  There were police reports that corroborated what

2    Crystal Trevino said.

3        What is also contained within those reports is the fact

4    that as Mr. Thomas was being chased by the police, he shot

5    back at them.  This is an individual who has preyed upon some

6    of the most vulnerable that we have in our society.  He has

7    continued to do so even when he has been jailed and

8    incarcerated.

9        He is violent.  His convictions show that, the testimony

10   shows that.  And for those reasons, Your Honor, we're going to

11   ask for the appropriate sentence for a man with his criminal

12   history, with what he's done, and the lack of touch with not

13   only reality but the consequences of what he did and the

14   people that he preyed upon and that he hurt.

15       Your Honor, we do not believe that 360 is enough and we

16   would ask this court to sentence him accordingly.

17           THE COURT:  All right.  Thank you, Mr. Elmore.

18       Upon review of the sentencing materials filed by both

19   parties including the attachments, the exhibits therein, a

20   review of the presentence investigation report and considering

21   the duration and nature of the offenses and convictions as

22   well as defendant's personal characteristics, his criminal

23   history, the court finds that defendant is not separated from

24   the heartland or the mine-run of similarly situated defendants

25   to a degree that warrants any departure or variance from the

1    advisory guideline range.  Therefore the defendant's motion

2    for variance, departure, or non-guideline sentence at docket

3    number 152 is denied.

4        The court also recognizes that the United States

5    Sentencing Guidelines are advisory and not mandatory but

6    nonetheless I've considered the guidelines along with all

7    factors set forth in Title 18, U.S.C., Section 3553(a) to

8    reach what I believe will be the appropriate and reasonable

9    sentence in this case.

10       In determining a sentence I've considered the nature and

11   circumstances of the offenses, I've considered Mr. Thomas's

12   personal characteristics, I've considered his extensive

13   criminal history.  I've considered the advisory sentencing

14   guideline calculations as noted in the presentence report and

15   I've considered sentencing disparities among defendants.

16       This case involved the defendant, a previously convicted

17   felon, recruiting women to work as prostitutes for him.

18   Specifically the defendant transported women to multiple

19   states for purposes of prostitution.  On at least one occasion

20   the defendant possessed a firearm and threatened the use of

21   said firearm.

22       Additionally a victim of the sex trafficking offense was

23   subpoenaed for grand jury testimony and the defendant

24   attempted to convince the victim to either lie or avoid

25   providing her testimony.

1     The defendant is 37 years old with an extensive criminal

2   history, a history of gang affiliation, a history of substance

3   abuse, and a history of some mental health concerns.  Based

4   upon these factors a sentence within the advisory guideline

5   range is reasonable and sufficient but not greater than

6   necessary to meet the requirements and objectives set forth in

7   Title 18, U.S.C., Section 3553(a).

8     This sentence will reflect the seriousness of the

9   offense, serve as an adequate deterrent to this defendant,

10  promote respect for the law, provide just punishment for the

11  offenses and provide protection for the public from further

12  crimes by the defendant, as well as provide correctional

13  treatment for the defendant in the most effective manner.

14    A term of supervised release with appropriate special

15  conditions based upon these factors will allow Mr. Thomas the

16  opportunity to reintegrate into the community upon release

17  from imprisonment, be monitored for future law violations, and

18  receive appropriate substance abuse and sex offender

19  treatment.

20    Mr. Thomas, would you approach the lectern with your

21  counsel, sir.

22    Mr. Thomas, you appear before the court today for the

23  purpose of sentencing having previously been found guilty of

24  Counts 1, 2, 3, 5, 7, 8, 9, 10 and 11 of the fourth

25  superseding indictment.

1    In accordance with applicable law it is the order and

2    judgment of this court that you, Byron Cordell Thomas, are

3    hereby committed to the custody of the Bureau of Prisons to be

4    imprisoned for a term of 360 months.  Said sentence shall

5    consistent of 180 months as to Count 1, 240 months as to each

6    of Counts 2 and 10.  120 months as to Counts 3, 5, 7 and 8.

7    And 360 months as to each of Counts 9 and 11.  Those counts

8    shall run concurrently each with the other.

9    The court recommends the Bureau of Prisons evaluate and

10   determine whether you are a suitable candidate for the most

11   comprehensive substance abuse and/or mental health treatment

12   programs available to you during your term of incarceration

13   such as the Residential Drug Abuse Program or other similar

14   programs.

15   The court also recommends that the Bureau of Prisons

16   evaluate and determine whether you are a suitable candidate

17   for the Career Starter Program or other similar vocational

18   training programs during your term of incarceration.

19   Upon release from imprisonment you shall be placed on a

20   term of supervised release for a term of 15 years.  Said term

21   shall consist of three years as to each of Counts 1, 2 and 10,

22   and 15 years as to Counts 3, 5, 7, 8, 9 and 11, and those

23   terms shall run currently each with the other.

24   Should the term of supervised release be revoked, an

25   additional term of imprisonment of up to two years could be

1   imposed as to Counts 1, 2, 3, 5, 7 and 8, and five years per

2   count as to Counts 9 and 11, and that could be imposed upon

3   revocation.

4       Immediately upon release from custody but in no event

5   later than 72 hours following your release you must report in

6   person to the probation office in the district where you are

7   authorized to reside.

8       While on supervised release you must not commit another

9   federal, state, or local crime.  You must not own, possess, or

10  have access to a firearm, ammunition, destructive device or

11  any other dangerous weapon.

12      You must at the direction of the United States Probation

13  Office cooperate with and submit to the collection of a DNA

14  sample for submission to the Combined DNA Index System.  You

15  must not possess a controlled substance and you must refrain

16  from any unlawful use of a controlled substance.

17      You must submit to one drug test within 15 days of your

18  release from custody and thereafter you shall submit to at

19  least two additional periodic drug tests not to exceed eight

20  tests per month.

21      You shall comply with the standard conditions that have

22  been adopted by this court and/or as set out in the judgment

23  because they establish the basic expectation for your behavior

24  while on supervised release and they identify the minimum

25  tools needed by the probation office to keep informed, report

1   to the court and bring about improvement in your conduct and

2   condition.

3       You shall also comply with the following additional

4   special conditions:  Conditions 1 through 3, 5 and 7 of the

5   special sex offender conditions, the special mental health

6   condition, the special substance abuse treatment and testing

7   condition, and the special work force development condition.

8       You are also hereby prohibited from attempting to or

9   having any contact whatsoever with the victims in this case

10  C.T., W.T., M.N., C.Z., K.D., J.F. and T.B.  That is either

11  directly or indirectly, in person, through others, by

12  telephone, mail, electronic means or in any other manner at

13  any time or place unless specifically authorized by this

14  court.  You shall remain 100 yards away from them, their

15  places of residence, their places of employment or school at

16  all times.

17      Now based upon your financial profile as outlined in the

18  presentence report I find that you do not have the ability to

19  pay a fine and therefore no fine will be imposed.

20      I have also considered the special monetary assessment

21  pursuant to Title 18, U.S.C., Section 3014.  However, based

22  upon your financial profile as outlined in the presentence

23  report I find that you do not have the ability to pay a fine

24  due to being indigent and therefore the court does not impose

25  a special monetary assessment.

1      You shall, however, pay mandatory special monetary

2  assessment of $100 per count for a total of $900.  This

3  assessment is to be paid immediately to the United States

4  Court Clerk for the Northern District of Oklahoma.

5      Mr. Thomas, I have a duty to advise you that you may have

6  the right to appeal the sentence that has been imposed.  Any

7  such appeal must be filed within 14 days of the date the

8  judgment is entered.  Mr. Deane will remain your counsel

9  during this 14 day time of appeal.

10     Now, Mr. Thomas, often at this point in a sentencing, you

11 know, I ask someone such as yourself, you know, what are your

12 gifts and talents.  But I have a feeling you already know what

13 your gifts and talents are.  You're a very strong-minded man,

14 you said that.  I agree with you.  You are not afraid to speak

15 up for yourself.  I agree with you there too.

16     My question to you really is a rhetorical question is

17 going forward from this day forward, how will you use those

18 gifts, how will you use those talents.  And my suggestion to

19 you is to look for a constructive way to use those gifts and

20 talents.

21     You do have -- you do have them, you know what they are,

22 but it seems to me that your view of the situation is a little

23 bit off.  I mean you've stated a lot of grievances and it's

24 apparent that none of these grievances you feel that you're

25 responsible in any way for.  That's very apparent.

1      You know maybe rethink things.  Maybe things will look a

2  little differently when you, you know, when you think about

3  what happened and what your actions were and whether you had

4  any responsibility for that.  It's clear that you don't think

5  that you did.

6      Anyway, that's my advice to you.  Take it for what it's

7  worth.  You're your own man, you're going to do your own

8  thing, I think that's pretty apparent.

9      Mr. Deane, do you have anything further on behalf of Mr.

10  Thomas today?

11          MR. DEANE:  Nothing at this time, Your Honor.

12          THE COURT:  Anything further on behalf of the

13  government?

14          MR. ELMORE:  No, Your Honor.

15          THE COURT:  Does the government move to dismiss the

16  indictment, superseding indictment, second superseding

17  indictment and the third superseding indictment?

18          MR. ELMORE:  Yes, Your Honor.

19          THE COURT:  All right.  Those indictments will be

20  dismissed.

21      All right.  The defendant is remanded to the custody of

22  the United States Marshals Service.  Counsel, you may be

23  excused.

24      (PROCEEDINGS CONCLUDED.)

25

1

2                        **REPORTER'S CERTIFICATION**

3        I CERTIFY THAT THE FOREGOING IS A TRUE AND ACCURATE

4  TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

5                   CERTIFIED:        S/Laura Griffin
                                    Laura Griffin, RMR, CRR
6                                    United States Court Reporter
                                    333 W. 4th Street, RM 411
7                                    Tulsa, OK  74103
                                    (918) 699-4879
8                                    laura_griffin@oknd.uscourts.gov.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25